Darrell ISHAM, Appellant

v.

STATE of Texas, Appellee.

No. 11–06–00311–CR.

Court of Appeals of Texas,
Eastland.

May 28, 2008.

Darrell Isham, Tennessee Colony, Richard W. Kennedy, Attorney At Law, Henderson, TX, for appellant.

D. Matt Bingham, Criminal District Attorney, Michael J. West, Assistant District Attorney's Office, Tyler, TX, for appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

RICK STRANGE, Justice.

The jury convicted Darrell Isham of manufacturing more than 400 grams of methamphetamine. The trial court sentenced Isham to life in prison and imposed a fine of $100,000. We find that the State has confessed error by failing to file a brief but affirm the conviction after an independent review because the evidence is legally and factually sufficient and because trial counsel was not constitutionally ineffective.

### I. *Procedural History*

Isham was indicted for manufacturing 400 grams or more of methamphetamine by chemical synthesis. Isham initially elected to have the jury assess punishment in the event of conviction, but he subsequently requested that the trial court assess punishment. The jury found Isham guilty, and the trial court sentenced him to life in prison and ordered him to pay a fine of $100,000. Isham filed a motion for new trial and an amended motion for new trial. These were overruled by operation of law.

■ Isham filed a notice of appeal. However, Isham's notice was two days late, and the Twelfth Court of Appeals dismissed his appeal for lack of jurisdiction. Isham filed an application for writ of habeas corpus. The Texas Court of Criminal Appeals found that counsel rendered ineffective assistance and allowed him to file an out-of-time appeal. Isham filed a new notice of appeal, and the Texas Supreme Court transferred Isham's appeal to this court in a docket equalization order. The following events transpired in this court:

> February 20, 2007 Isham's brief is filed. This court advises counsel that Isham's brief has been received and that the State's brief was due on or before March 22, 2007.
>
> April 5, 2007 This court, on its own motion, directs the State to file its brief on or before May 7, 2007. "Otherwise, we will assume the State wants to confess error and will set this case for hearing."
>
> February 21, 2008 This court advises counsel that the case is being submitted without oral argument on March 13, 2008.
>
> March 31, 2008 The State submits a brief and motion for extension and late filing of brief.
>
> April 3, 2008 The State's motion for extension and late filing is overruled.

Because the State failed to timely file a brief or motion for extension—despite having over one year to do so and despite the original courtesy notice and two subsequent reminders, we will treat the State as having confessed error and will analyze this appeal accordingly.

### II. *Issues on Appeal*

Isham challenges his conviction and sentence with three issues. Isham complains that trial counsel was constitutionally ineffective because he provided incorrect advice about Isham's ability to receive a probated sentence from the tri-

al court. Isham also complains that the jury's verdict was supported by legally and factually insufficient evidence.

## III. *Analysis*

### A. *The State's Confession of Error.*

 A confession of error by the prosecutor is not conclusive when reviewing an appeal. *Saldano v. State,* 70 S.W.3d 873, 884 (Tex.Crim.App.2002). The appellate court must make an independent examination of the merits of the claim of error. This examination must necessarily be limited to the arguments advanced in the trial court; otherwise, we run afoul of the prohibition of advancing argument on behalf of the parties. *Siverand v. State,* 89 S.W.3d 216, 220 (Tex. App.-Corpus Christi 2002, no pet.).

### B. *Sufficiency of the Evidence.*

### 1. *Standard of Review.*

 To determine if the evidence is legally sufficient, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jackson v. State,* 17 S.W.3d 664, 667 (Tex.Crim.App.2000). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App.1992). The factfinder may choose to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986).

 To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Watson v. State,* 204 S.W.3d 404, 414 (Tex. Crim.App.2006). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id.* at 414–15.

### 2. *The Evidence.*

 Isham complains that the evidence is legally and factually insufficient to support his conviction because there was insufficient evidence linking him to the contraband. To sustain Isham's conviction, the State was required to prove that Isham knowingly and intentionally manufactured methamphetamine. TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon 2003). This required the State to affirmatively link Isham to an interest in the place where the manufacturing occurred or to the actual act of manufacturing. *East v. State,* 722 S.W.2d 170, 172 (Tex.App.-Fort Worth 1986, pet. ref'd). The purpose of this requirement is to protect the innocent bystander who merely inadvertently happens onto a methamphetamine lab.

 No set formula exists to dictate a finding of affirmative link sufficient to support a conviction. Factors that may affirmatively link an accused to contraband include the following: (1) whether the accused was present when the search was conducted; (2) whether the contraband was in plain view; (3) whether the accused was in close proximity to and had access to the contraband; (4) whether the accused was under the influence of narcotics when arrested; (5) whether the accused possessed other contraband or narcotics when arrested; (6) whether the accused made incriminating statements when arrested; (7) whether the accused attempted to flee; (8) whether the accused made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia was present; (11) whether the accused owned or had the

right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the accused was found with a large amount of cash; and (14) whether the conduct of the accused indicated a consciousness of guilt. *Swarb v. State*, 125 S.W.3d 672, 684 (Tex.App.-Houston [1st Dist.] 2003, pet. dism'd). The number of factors present is not as important as the logical force or the degree to which the factors, alone or in combination, tend to affirmatively link the accused to the contraband. *Isbell v. State*, 246 S.W.3d 235, 238 (Tex.App.-Eastland 2007, no pet.).

 Isham concedes that he owned the home where the meth lab was found, that the police found a significant quantity of methamphetamine at his home, and that the lab equipment was found in a place convenient to and in close proximity to him. This, however, was not the only evidence linking him to the lab. Detective Steve Henry received information from two different informants implicating Isham in the manufacturing of methamphetamine. Detective Henry obtained a search warrant and executed that warrant at approximately 1:00 a.m. Isham was home when the police arrived and was detained while attempting to leave through a back door.

The police found a significant and active methamphetamine manufacturing operation when they searched Isham's house. Methamphetamine was being cooked when the police arrived. They noticed a strong ammonia odor before they even entered the house. In fact, the odor was so strong that they were forced to use gas masks. They found precursors and manufacturing equipment both inside and outside the residence. The material inside the house was found in the kitchen, master bedroom, and master bathroom.

Kevin Minor, a Department of Public Safety criminologist, testified that he found the remains of a prior cooking operation, evidence of the initial stages of manufacturing, material that was in the final stages of manufacture, and finished methamphetamine. He testified that there were signs of two or three separate cooking operations in the house. He measured over 3,000 grams of material that tested positive for the presence of methamphetamine.

The State also introduced evidence that, the morning prior to his arrest, Isham asked a friend if he knew of anyone that would purchase a large amount of meth. Isham told this friend that he was trying to raise bond money for his son-in-law and that he would be making meth at his house that afternoon. Several months after his arrest, Isham told one of the State's witnesses that he had been in the middle of cooking meth when he was arrested but asked her to testify that he had been with her the night of the raid.

This is legally sufficient evidence to link Isham to the manufacturing operation. Isham correctly notes that there was no evidence that he had any money, contraband, or paraphernalia on his person; that he was not impaired; that he did not make an incriminating statement (to the police); and that he arguably did not attempt to escape or flee. However, when the evidence linking Isham to the lab is viewed in the light most favorable to the verdict, a rational juror could find beyond a reasonable doubt that Isham was manufacturing methamphetamine in his house. There was ample evidence that a large, ongoing operation was in place and that anyone in the immediate area of the house—let alone inside it—would have been aware of the lab. Moreover, the fact that Isham was arrested at his house at one in the morning is inconsistent with the notion that he was an innocent bystander in the wrong place at the wrong time.

The evidence is also factually sufficient. Isham argues that no rational juror could have found him guilty "given the pathetic lack of solid evidence" against him. He contends that no one checked his car hood to see if the engine was warm and suggests that a warm engine would mean that he had just arrived. He notes that his fingerprints were not found on any of the lab equipment and that the proffered reason for his cooking—to raise bond money for his son-in-law—makes no sense because he and his son-in-law did not like each other. Finally, he argues that, even if there is evidence that he cooked some of the 3,000 grams of material containing methamphetamine, there is no indication that he cooked all of it.

We disagree with Isham's characterization of the evidence. There was evidence that Isham was planning on cooking a large quantity of methamphetamine prior to his arrest and that, after his arrest, he admitted to one of the State's witnesses that he had been cooking and asked her to change her testimony. There was evidence that a working lab was found in Isham's house at one in the morning, that manufacturing equipment and supplies were found in three separate rooms in the house, and that there were remnants of prior manufacturing operations in a burn pile outside the residence. There was evidence of completed operations, nearly completed operations, and ongoing operations. There was no evidence that Isham had been anywhere but his house that night, and he was arrested while trying to leave through a back door. While police were unable to find Isham's fingerprints on ten items of lab equipment, the jury could also reasonably consider that the police were only able to find a single latent fingerprint with sufficient detail to make an identification.

The evidence is not so weak that the jury's verdict is clearly wrong or manifestly unjust, nor is the verdict against the great weight and preponderance of the evidence. Isham's second and third issues are overruled.

### C. Ineffective Assistance of Counsel.

To prevail on a claim of ineffective assistance of counsel, an appellant must establish that his lawyer's performance fell below an objective standard of reasonableness and that there is a "reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim.App.2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex.Crim.App.1986). The purpose of this two-pronged test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812–13 (Tex.Crim.App.1999).

The review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim.App.2000). Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768 (Tex.Crim.App.1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex.App.-Eastland 2005, pet. ref'd). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demon-

strate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996)).

 Generally, the record on direct appeal will not be sufficient to show that trial counsel's representation was so lacking as to overcome the presumption of reasonable conduct. *Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App.2002). We do not inquire into trial strategy unless no plausible basis exists for trial counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex.Crim.App.1981). When the record contains no evidence of the reasoning behind trial counsel's actions, we cannot conclude that counsel's performance was deficient. *Jackson*, 877 S.W.2d at 771.

 In this case, we are not required to speculate. Trial counsel recommended going to the trial court for punishment because of a mistaken belief that this would make Isham eligible for deferred adjudication. Isham originally elected to have the jury assess punishment. Shortly before trial, he filed his own handwritten application asking the trial court to assess punishment in the event of a guilty verdict. Counsel brought this application to the trial court's attention during voir dire. The trial court granted Isham's request, and counsel announced that he was filing an application for community supervision. During the punishment hearing, counsel asked the trial court for a deferred adjudication of ten years. The trial court responded that it could not do so because Isham had been found guilty by a jury. Counsel acknowledged his mistake and thanked the trial court for the clarification.

Counsel then made a record of his conversations with Isham concerning the punishment election. Counsel told the trial court that he had explained to Isham that the jury could not consider community supervision, and he called Isham as a witness. Isham testified as follows:

Q. Mr. Isham, I consulted with you before this trial about what your rights were as far as having—going to the Judge or going to the jury; right?

A. Yes.

Q. And your instructions to me were that you wanted to enter a not guilty plea; right?

A. Right.

Q. And we discussed what a Judge could do and what a jury could do, and you remember those discussions; right?

A. Yup.

Q. Okay. And in discussing what a Judge could do or what a jury could do, is it correct to say that what you instructed me was you wanted to enter a not guilty plea because you considered yourself not guilty no matter what either could do—whatever the Judge could do or whatever the jury could do—it didn't really matter? And correct me if I'm wrong, but I believe your instructions to me were that you wanted to enter a not guilty plea because you believed yourself not guilty; is that correct? So whether or not the Judge could give a deferred or not give a deferred at any particular time—it really didn't make any difference to you, is that correct, because you were—you instructed me that it was going to be not guilty no matter what; is that correct?

A. I don't really understand what you mean by that.

Q. Well, do you understand what the Judge just said about that she cannot do deferred adjudication at this point? She could have done it if a plea of guilty had been entered to her. Do you understand that?

A. No, I didn't know you could do that. I didn't know that she could stop

it with a deferred like that—if I was offered deferred that I could stop and plead guilty. I was never told that. I was never told the Judge could give me deferred if I entered a plea of guilty.

Q. Okay. So would that have changed your instructions to me?

A. Somewhat, yeah.

Q. If I had told you that—Well, it's correct to say that I informed you that she could give you—that only the Judge could give you a deferred? A jury could not give you deferred. I told you that?

A. Yeah, you told me that.

Q. Okay. And then you instructed me that whether the Judge could give deferred or not didn't matter. That what mattered was you wanted to enter a plea of not guilty. Is that correct?

A. Yeah, I told you I wanted to enter a not guilty. I don't remember the whole conversation. I assume you're right.

The trial court also questioned Isham.

THE COURT: Just a couple of quick questions, if you don't mind. Did you understand when you elected to have—go to a jury on a plea of not guilty but elected to have the Judge assess punishment—did you understand at that time that the jury could not grant probation if [it] found you guilty of the manufacture of methamphetamine, 400 grams or more, because it was an aggravated punishment range and the jury could not grant you probation? Did you understand that?

ISHAM: Yes, ma'am.

THE COURT: Now, did you understand that this Court could not grant you probation if you were found guilty of aggravated manufacture of methamphetamine, more than 400 grams, because the jury would have found you guilty already and your sentence would be 15 to 99 or life; therefore, you're not eligible for regular probation? Did you understand that?

ISHAM: Well, I was told that—I was told that I could be eligible for regular probation if I take the judgment from the Judge—the punishment from the Judge.

THE COURT: Do you understand now that's not the case? A jury could not grant you probation and the Judge cannot grant you probation? Do you understand that?

ISHAM: Yes, ma'am.

THE COURT: All right. Understanding that, would that have changed your decision to have a jury trial on the issue of guilt or innocence?

ISHAM: Yes, ma'am.

■ The record establishes that counsel misunderstood the law on deferred adjudication and that he passed this misunderstanding on to his client. Counsel's mistake, alone, is insufficient to establish an ineffective assistance of counsel claim. There must also be evidence:

(1) that the defendant was initially eligible to receive probation;

(2) that counsel's advice to go to the trial judge for sentencing was not given as part of a valid trial strategy;

(3) that the defendant's decision to have the judge assess punishment was based on his attorney's erroneous advice; and

(4) that the defendant's decision would have been different if counsel had correctly informed him of the law.

*State v. Recer*, 815 S.W.2d 730, 731–32 (Tex.Crim.App.1991).

Isham was *initially* eligible for probation. His criminal record consisted only of a 1989 misdemeanor driving while intoxicated conviction and a 2001 Class C misde-

meanor conviction. The *Recer* probation eligibility requirement is sometimes described as requiring proof that the defendant "was eligible to receive probation."[1] We believe the Court of Criminal Appeals included the word *initially* to require that the defendant's eligibility be determined as of the filing of the punishment election rather than at the time of the punishment hearing. We recognize that Isham was indicted for an offense that, if proven, precluded consideration of community supervision by the judge or jury. However, if he had been convicted of a lesser included offense—and the lesser included offense of manufacturing between 200 and 400 grams was in the court's charge—community supervision would have been a permissible punishment.

Isham has also satisfied the second and third requirements. Isham's strategy to go to the trial court for punishment in hopes of obtaining deferred adjudication was not a valid strategy. Because the jury was deciding guilt or innocence, the trial court would assess punishment only if the jury first found Isham guilty. That eliminated any possibility of receiving deferred adjudication. Isham's punishment election was based upon his attorney's erroneous advice. It is clear that he wanted to be placed on community supervision if convicted, that he knew the jury could not give him community supervision, and that he thought the trial court could give him deferred adjudication because his attorney told him so.

The final requirement is more problematic because Isham is not asking for a punishment hearing with a jury but for a new trial and because, while Isham argues to this court that if correctly advised he would have pleaded guilty, his testimony before the trial court on this point was at best unclear. Isham twice admitted that he told his attorney to enter a plea of not guilty. When counsel asked if correct legal advice would have changed his instructions, Isham responded, "Somewhat, yeah." In what way the record does not show, but we note that in response to a prior question he referred to pleading guilty if offered deferred adjudication. When the court questioned Isham, he testified that correct legal advice would have changed his decision to have a jury trial, but he did not say whether he would have pleaded guilty or simply waived a jury. However, Isham's final comments to the trial court and his posttrial conduct causes us to conclude that he was not willing to unconditionally plead guilty.

After the trial court rendered Isham's sentence, it asked him if he had any problems or complaints with his lawyer. He responded that he did not feel like counsel represented him to the best of his ability stating, "There is a lot of things I asked to be brought up that wasn't brought up. Even the idea of knowing how to manufacture was never brought up. He knew—I mean, I told him—I tried to bring it up I didn't even know how to manufacture." Isham filed a pro se motion for new trial, argued that one of the State's witnesses had recanted, and advanced fifty-six challenges to the State's evidence. He also executed an affidavit in support of his motion for new trial. That affidavit included a request that his counsel have more time to investigate before the next trial. At no point in the motion did he include even an alternative request for a new punishment hearing.

---

1. *See, e.g., Bernal v. State*, No. 08–00–00552–CR, 2002 WL 31087302 (Tex.App.-El Paso Sept.19, 2002, no pet.) (not designated for publication). We note that, even though the court phrased the requirement in this manner, it still examined the defendant's probation eligibility as of the time of his punishment election.

Isham's testimony is insufficient to establish the fourth *Recer* element. The incorrect legal advice Isham received concerned the trial court's ability to order deferred adjudication. That error impacted Isham's election to go to the trial court for punishment. Isham, therefore, needed proof that he would have otherwise elected to have the jury assess punishment. *See Recer*, 815 S.W.2d at 732 (rejecting ineffective assistance claim in part because the record did not reflect that appellant would have made a different sentencing election if correctly advised on the law).[2] The appropriate remedy in this instance would be a new punishment hearing before a jury.[3] Isham did not produce the necessary evidence and is not requesting appropriate relief.

 Even if we are incorrect and Isham has sufficiently shown that he would have otherwise pleaded guilty and if we assume that this is sufficient to constitute ineffective assistance, he has not demonstrated harm. Isham correctly notes that he received the maximum sentence and argues that, if he had not insisted on a jury trial, the trial court would have at least considered the possibility of a deferred adjudication or otherwise might have considered a less severe sentence. We cannot reach either conclusion on the record before us. The trial court's sentence is significant to be sure; but the trial court knew that Isham appeared for trial under the influence of methamphetamine, was found guilty of operating a large and active manufacturing operation, was in possession of over seven times the amount of methamphetamine-containing material necessary to constitute an aggravated offense, and tried to suborn perjury. Each of these factors would have been relevant to a punishment decision even if Isham had originally pleaded guilty. The trial court's punishment forecloses any belief that deferred adjudication was a possibility. The multitude of aggravating factors precludes any determination that Isham's plea was determinative of his punishment. In fact, when the State argued that Isham had not accepted responsibility for his own actions, the trial court immediately and sua sponte announced that it would not consider that argument. Isham's first issue is overruled.

### IV. *Holding*

The judgment of the trial court is affirmed.

---

2. *See also Embree v. State*, Nos. 05–01–01052–CR & 05–01–01053–CR, 2003 WL 1492950 at *8 (Tex.App.-Dallas March 25, 2003, pet. ref'd) (not designated for publication) (rejecting ineffective assistance claim because the record did not reflect that defendant's sentencing decision would have been different if he had received correct legal advice on the trial court's authority to assess community supervision). *But see Bernal*, 2002 WL 31087302 at *2 (record established that defendant went to judge rather than jury for sentencing on the incorrect legal advice of counsel).

3. *See, e.g., Bernal*, 2002 WL 31087302 at *2.