**Opinion filed December 18, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00221-CR

_____

## JAVIER MARTINEZ ARIAS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause No. A-22-1294-CR**

## M E M O R A N D U M   O P I N I O N

In a seven-count indictment, Appellant, Javier Martinez Arias, was charged with offenses involving sexual assault against four victims: the first-degree felony offenses of aggravated kidnapping of A.V. (Count One), aggravated kidnapping of B.R. (Count Three), aggravated sexual assault of B.R. (Count Four), and aggravated kidnapping of L.B. (Count Five); and the second-degree felony offenses of attempted aggravated sexual assault of A.V. (Count Two), attempted aggravated

sexual assault of L.B. (Count Six), and sexual assault of B.M. (Count Seven).[1] *See* TEX. PENAL CODE ANN. § 15.01(a), (d) (West Supp. 2025), § 20.04(a)(4), (c) (West 2019), § 22.021 (West Supp. 2025), § 22.011(a)(1)(A), (f) (West Supp. 2025). The jury found Appellant guilty on all seven counts and assessed his punishment at life imprisonment for each first-degree offense and twenty years' imprisonment for each second-degree offense, all to be served in the Institutional Division of the Texas Department of Criminal Justice. *See* PENAL §§ 12.32, 12.33. The trial court sentenced Appellant accordingly. In Appellant's sole issue on appeal, he contends that his trial counsel was deficient in failing to object to several hearsay statements at trial. We affirm.

## I. *Factual and Procedural History*

At trial, only two of the four victims testified. We summarize their testimony as well as the testimony of relevant witnesses below.

### A. *A.V.*

A.V. testified that, on April 26, 2022, she was a homeless drug addict, staying in a rundown, abandoned RV. She had been loitering outside a closed game room, when a man pulled up in a white SUV. He offered to take her to get something to eat, which she accepted; she sat in the backseat of his vehicle. He then drove her down a dirt road and parked next to an oilfield pumpjack in the "middle of nowhere." A.V. testified that she "knew something was wrong," and that "the first thing that came to mind was human trafficking." After putting the evhicle in park, the man got into the backseat and forced himself on top of A.V. When A.V. told him to stop, he punched her in the stomach. A.V. testified that at that point, she stopped resisting

---

[1]To protect the identity of the victims, we refer to them by the pseudonym given in the indictment. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); *see generally* TEX. R. APP. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

but notified him she was on her menstrual cycle. Once he confirmed that by pulling down her underwear, he got off her and told her that she could leave. A.V. waited until he drove away before walking to a nearby "guard station," where someone called the police on her behalf.

Odessa Police Department Corporal Bandy Blackmon responded to the call and spoke with A.V. Corporal Blackmon testified that A.V. told him a man had physically assaulted her and tried to sexually assault her inside his white Yukon SUV. The man was deterred only because when he pulled her pants down, he saw she was menstruating. A.V. identified Appellant as the man responsible both in a lineup and at trial.[2]

B. *B.M.*

Sergeant Vijitta Y with the Odessa Police Department testified that, on July 8, 2022, B.M. went to the police station to report a sexual assault that had occurred "by a pumpjack." Sergeant Y described B.M. as distraught and stated that she was crying while she spoke with him. After taking her statement, B.M. was transported to a nearby hospital where she was examined by SANE Nurse Bianca Barrientos. Barrientos testified that as part of her examination, she recorded B.M.'s medical history, which included B.M.'s statements about the sexual assault. B.M. told Barrientos that she had been walking down the street when a man approached her in his vehicle, and that he had driven her "somewhere and raped [her]."

While the SANE exam revealed no visible exterior injuries, B.M. had an abrasion inside her vaginal canal. Vaginal swab samples taken during the examination later tested positive for semen. Laura Baker, the quality manager at the Texas Department of Public Safety Crime Laboratory in Lubbock, testified that the DNA profile obtained from B.M.'s vaginal swab sample contained a mixture of two

---

[2]Sergeant Christopher John Kristufek with the Ector County Sherrif's Office also testified that A.V. had identified Appellant in a lineup.

individuals. According to Baker, the probability that the DNA profile came from B.M. and Appellant was "305 octillion times greater" than if it came from B.M. and an unrelated unknown individual.

Ector County Jail Master Sergeant Taelor Warner testified that, at the time of trial, B.M. was in custody on a misdemeanor charge and was in a "state of psychosis." Sergeant Warner stated that B.M. had been evaluated, found unfit to testify, and was awaiting transfer to an impatient mental health institution.

C. *B.R.*

On July 11, 2022, medics responded to a 9-1-1 call concerning an attempted sexual assault occurring in the same area as the sexual assaults on April 26, 2022, and July 8, 2022. Odessa Fire Rescue paramedic Blake Terry testified that B.R. was crying and appeared to have difficulty walking. B.R. was also "bruised up pretty good around her face" and had blood around her mouth. Terry testified B.R. told him that "the man" had picked her up from a hotel, driven "her out to a pumpjack," raped her, and left her there.

B.R. testified that she had been sitting outside a hotel when a man in a white Chevy Tahoe pulled up. The man spoke only Spanish, which she did not understand. B.R. testified that she used Google Translate to communicate to him that she needed a ride to the bus station in Midland. He agreed and she got into his vehicle. Instead, the man drove her to a dirt road, parked next to a pumpjack, and started "playing at [sic] [her] pants." Realizing what the man was trying to do, B.R. told him she was a fifteen-year-old runaway, and police were looking for her. B.R. then tried to open the passenger door but he reached over her and shut it. He got on top of B.R. and she started to cry. She testified that she hit him, which prompted him to punch her in the face and chest. B.R. unwillingly crawled into the backseat, where he penetrated her vaginally. When he was done, she exited the vehicle, and he drove away. B.R. testified that she walked to a paved road, where bystanders stopped to

4

call 9-1-1 and B.R.'s mother. B.R. was transported to the hospital, and she later identified Appellant as her assailant in a photo lineup.

Samantha Galvan, the SANE nurse who examined B.R. at the hospital testified that B.R. presented with "manic behavior." As part of her treatment of B.R., Galvan asked B.R. about her injuries. B.R. told Galvan that a man had taken her to a dirt road where he sexually assaulted her. Because B.R. described her assailant as having "green stuff" on his genitals, B.R. needed to be tested for sexually transmitted diseases. Galvan opined that B.R.'s injuries, which included dried blood around her lips, swelling on the bridge of her nose, a missing left front tooth, and two red linear markings on her chest and breast, were consistent with the assault she had described. Vaginal swabs taken from B.R. also resulted in a positive presumptive test for the presence of semen.

Texas Department of Public Safety forensic scientist Brent Hester testified that the DNA profile obtained from B.R.'s vaginal swab sample contained a mixture of two individuals. Hester explained, "The probability of obtaining this profile if the DNA came from [B.R.] and suspect [Appellant] is 241 octillion times greater than the probability of obtaining the profile if the DNA came from [B.R.] and one unrelated, unknown individual."

D. *L.B.*

Nine days later, on July 20, 2022, medics responded to another report of a sexual assault occurring in the same general location. Eduardo Garcia testified that it was around lunchtime when he saw an SUV on a dirt road usually frequented by oilfield workers. "[F]lailing hands out of the back seat" caught his attention. Garcia slowed down his vehicle and a woman, later identified as L.B., ran up to his vehicle. Garcia testified that L.B. appeared scared and had visible scratch marks and blood coming from her hand. L.B. told Garcia she needed a ride because the man in the SUV was trying to "rape" her. The man in the SUV left once Garcia called 9-1-1,

5

but Garcia provided the man's license plate number to police. Garcia later identified Appellant in a lineup as the man in the SUV who had been with L.B.

Dr. Brian Taylor, the emergency room physician who treated L.B., testified that L.B. came in as a Code 3 by ambulance, which is the highest trauma level. Dr. Taylor testified that his initial role was to determine her potential injuries and "find out what happened . . . [to] determine what rapid workup" needed to be done for purposes of treatment. Dr. Taylor testified that L.B. told him that a man had offered her a ride home but turned off onto a dirt road and attempted to "touch her." She managed to throw open the door and jump out onto the side of the road. Dr. Taylor testified that L.B. had abrasions across her body consistent with her statements.

Ector County Sheriff's Office Investigator Christopher Bell spoke with L.B. at the hospital. L.B. told Investigator Bell that Appellant had pulled up next to her on the street and asked if she needed a ride. Appellant agreed to take her to Midland, but after she got inside Appellant's vehicle, he drove her down a "caliche lease road." L.B. was able to jump out of the moving vehicle, but Appellant stopped, found her, and returned her back into his vehicle, where he placed her in the backseat and started touching her thighs. Appellant stopped only when another vehicle neared.

E. *Appellant's Testimony*

At trial, Appellant testified that his interactions with each named victim had been consensual. Appellant explained that he believed each woman was a prostitute, who had agreed to perform sexual acts in exchange for money. Appellant denied assaulting any of the women.

II. *Standard of Review and Applicable Law*

A. *Ineffective Assistance of Counsel*

We review an ineffective-assistance-of-counsel complaint under the two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed

on a claim of ineffective assistance of counsel, Appellant must satisfy both prongs of the *Strickland* standard: (1) performance and (2) prejudice. *Strickland*, 466 U.S. at 687; *see Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). The failure to succeed on either *Strickland* prong is fatal to a claim of ineffectiveness. *Perez*, 310 S.W.3d at 893.

First, Appellant must show that trial counsel's representation was deficient in that it fell below an objective standard of reasonableness. *Perez*, 310 S.W.3d at 892–93. Second, Appellant must show that trial counsel's deficient performance prejudiced his defense—that is, counsel's errors were so serious as to deprive Appellant of a fair trial and, as a result, there is a reasonable probability that the outcome of his trial would have been different but for counsel's errors. *Id.* at 893; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 687–88). The "reasonable probability" component must rise to the level such that it is sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. "This is a heavy burden which requires a 'substantial,' and not just a 'conceivable,' likelihood of a different result." *Walker v. State*, 406 S.W.3d 590, 599 (Tex. App.—Eastland 2013, pet. ref'd) (quoting *United States v. Wines*, 691 F.3d 599, 604 (5th Cir. 2012)).

There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Isham v. State*, 258 S.W.3d 244, 250 (Tex. App.—Eastland 2008, pet. ref'd). To overcome this deferential presumption, a claim of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson*, 9 S.W.3d at 814; *Walker*, 406 S.W.3d at 593–94. In this regard, we will not inquire into counsel's trial strategy unless no possible basis exists to support such strategy or tactics. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim.

App. [Panel Op.] 1981). Thus, in our analysis, we must make every effort to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

B. *Ineffective-Assistance-of-Counsel Challenges on Direct Appeal*

In most instances, direct appeal is an inadequate means by which to overcome the deferential presumption and show that trial counsel's representation was deficient and lacked tactical or strategic decision-making, because the record is typically undeveloped and will not show the extent of counsel's conduct and alleged failures. *Goodspeed*, 187 S.W.3d at 392; *Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813–14. This is especially true when the basis for counsel's trial strategy and decisions do not appear in the record. *Goodspeed*, 187 S.W.3d at 392. In such circumstances, trial counsel should be afforded an opportunity to explain his or her actions before being denounced as ineffective. *Id.*; *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003).

The record contains no motion for new trial, transcript of hearing thereon, or direct evidence of trial counsel's reasons or explanations for the challenged conduct, so trial counsel's performance must be reviewed with great deference and without resort to hindsight, and we "will assume that counsel had a [valid] strategy if any reasonably sound strategic motivation can be imagined." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). We will not speculate about counsel's motives or strategy in the face of a silent record. *Thompson*, 9 S.W.3d at 814. Therefore, if the record is silent as to any reason or explanation for counsel's actions, strategies, and alleged failures, as it is in this case, we "will not conclude [that] the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008); *Goodspeed*, 187 S.W.3d at 392; *Bone v. State*, 77 S.W.3d

828, 836 (Tex. Crim. App. 2002) (The defendant must show that there was no plausible, professional reason for counsel's specific acts or omissions.).

## III. *Analysis*

In his sole issue on appeal, Appellant contends that his trial counsel was ineffective because he failed to object to multiple instances of hearsay. As we stated above, Appellant did not file a motion for new trial. Accordingly, Appellant's trial counsel did not have the opportunity to explain or defend her actions or trial strategy or respond to what Appellant now contends constitutes deficient performance. Thus, for Appellant to demonstrate on direct appeal that his trial counsel rendered ineffective assistance, the record must affirmatively show that his counsel's representation "fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez*, 343 S.W.3d at 143; *see Strickland*, 466 U.S. at 687. Furthermore, when, as here, the record does not reveal counsel's reasoning or strategies, we "presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that [trial counsel] 'made all significant decisions in the exercise of reasonable professional judgment.'" *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (quoting *Strickland*, 466 U.S. at 690); *see Morales*, 253 S.W.3d at 697; *Screws v. State*, 630 S.W.3d 158, 164–65 (Tex. App.—Eastland 2020, no pet.).

Appellant specifically takes issue with testimony by Garcia, Dr. Taylor, Sergeant Kristufek, and Investigator Bell concerning L.B.; Investigator Bell and Terry concerning B.R.; Sergeant Y and Barrientos concerning B.M., and Corporal Blackmon concerning A.V. We first address the unobjected-to statements at trial that, for reasons explained below, the trial court would not have erred in overruling Appellant's hearsay objection had one been made. *See Poor v. State*, 715 S.W.3d 15, 41 (Tex. App.—Eastland 2024, pet. ref'd) ("When alleging ineffective assistance

of counsel based on the failure to object, an appellant must demonstrate that the trial court would have erred in overruling an objection had trial counsel made one." (first quoting *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); and then citing *Munoz v. State*, No. 11-13-00139-CR, 2015 WL 4053483, at *5 (Tex. App.—Eastland June 30, 2015, pet. ref'd) (mem. op., not designated for publication)).

A. *Medical Exception*

Hearsay is an out-of-court statement made for the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay evidence is inadmissible unless if falls within at least one of the recognized exceptions. *Templeton v. State*, 629 S.W.3d 616, 626 (Tex. App.—Eastland 2021, no pet.) One exception to the rule against hearsay is "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." TEX. R. EVID. 803(4). The State relies on this exception in part to support its argument that Appellant's ineffective-assistance-of-counsel claim is without merit.

Dr. Taylor, Barrientos, and Terry each testified regarding their respective treatment of L.B., B.M., and B.R., which included obtaining statements made by the victims during the course of treatment following the assaults. As such, counsel for Appellant could have determined that the testimony fell under the "[s]tatement [m]ade for [m]edical [d]iagnosis or [t]reatment" exception to the hearsay rule. *See id.*; *Taylor v. State*, 268 S.W.3d 571, 589 (Tex. Crim. App. 2008) (discussing the tacit presumption that patients understand that medical professionals' "questions are designed to elicit accurate information and that veracity will serve their best interest"); *Gutierrez v. State*, 630 S.W.3d 270, 280 (Tex. App.—Eastland 2020, pet. ref'd) ("[S]tatements describing acts of sexual abuse are pertinent to the victim's medical diagnosis and treatment." (quoting *Beheler v. State*, 3 S.W.3d 182, 188 (Tex. App.—Fort Worth 1999, pet. ref'd))); *see also Landaverde v. State*, No. 10-

23-00228-CR, 2025 WL 484636, at *3 (Tex. App.—Waco Feb. 13, 2025, pet. ref'd) (mem. op., not designated for publication) (counsel's alleged failure to object to doctor's testimony as to victim's statements did not constitute ineffective assistance of counsel); *Swan v. State*, No. 03-19-00422-CR, 2021 WL 1741872, at *8 (Tex. App.—Austin May 4, 2021, pet. ref'd) (mem. op., not designated for publication) ("The SANE's testimony about the medical-treatment purposes and uses of taking patient histories, including K.L.'s, supplied the trial court with a reasonable basis to conclude that K.L.'s history was admissible under Rule 803(4)."). Thus, Appellant has not established that trial counsel's performance fell below an objective standard of reasonableness by declining to object to hearsay for these statements. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142.

B. *Excited Utterance*

Another exception to the hearsay rule relied upon by the State, the excited utterance exception, provides that a statement that constitutes an excited utterance is not excluded by the hearsay rule. TEX. R. EVID. 803(2); *Templeton*, 629 S.W.3d at 626. The rule defines an excited utterance as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." TEX. R. EVID. 803(2). "The type of emotion that dominates the declarant is not critical; what is controlling is whether, at the time the statement was made, the declarant was still dominated by the emotions, excitement, fear, or pain that was caused by the startling event or condition." *Templeton*, 629 S.W.3d at 626. "Therefore, if the statement is an excited utterance, there can be no abuse of discretion to admit it." *Id.* (citing *Osbourn v. State*, 92 S.W.3d 531, 537–38 (Tex. Crim. App. 2002)).

11

When determining the admissibility of a statement that is offered as an excited utterance, we address three concerns:

> (1) the "exciting event" should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; and (3) the resulting statement should be sufficiently "related to" the startling event, to ensure the reliability and trustworthiness of that statement.

*McCarty v. State*, 257 S.W.3d 238, 241 (Tex. Crim. App. 2008). "[U]nder the excited utterance exception, the startling [or exciting] event may trigger a spontaneous statement that relates to a *much earlier* incident." *Id.* at 240. This comports with the purpose of the exception, which is based on the assumption that the person who makes an excited utterance is not then capable of the kind of reflection that would enable that person to fabricate the information that is related. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). Thus, "[t]he trustworthiness of the statement is founded on the fact that it is the *event* that speaks through the person and not merely the declarant relating the event." *Tienda v. State*, 479 S.W.3d 863, 875 (Tex. App.—Eastland 2015, no pet.) (emphasis added) (citing *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003)); *see Evans v. State*, 480 S.W.2d 387, 389 (Tex. Crim. App. 1972). An occurrence of an assault, sexual or physical, may qualify as a startling or exciting event. *Luna v. State*, No. 11-22-00259-CR, 2024 WL 3056135, at *6 (Tex. App.—Eastland June 20, 2024, no pet.) (mem. op., not designated for publication); *Wear v. State*, No. 02-16-00170-CR, 2017 WL 929529, at *1 (Tex. App.—Fort Worth Mar. 9, 2017, no pet.) (mem. op., not designated for publication).

Here, Garcia encountered L.B. as she was trying to escape from Appellant, who had just physically assaulted her and was attempting to sexually assault her. Garcia testified that L.B. was scared and visibly upset, and that he had to try to "calm

12

her down" as she spoke. Counsel could have reasonably concluded that Garcia's testimony regarding L.B.'s claim that Appellant was trying to "rape" her—a statement made while Appellant was still in close proximity—would fall under the excited utterance exception. *See Gross v. State*, No. 11-17-00060-CR, 2019 WL 613686, at *6 (Tex. App.—Eastland Feb. 14, 2019, pet. ref'd) (mem. op., not designated for publication) ("The spontaneous nature of the statement is the main factor to be considered when a court determines the admissibility of an excited utterance.").

The same can be said about A.V.'s statements to Corporal Blackmon. Corporal Blackmon was the responding officer who met with A.V. shortly after the assault and in close proximity to the location where she had just been assaulted. Corporal Blackmon described A.V. as "emotionally distraught" as she explained that she had just been beaten, physically undressed, and sexually assaulted. *See McFadden v. State*, No. 11-16-00221-CR, 2018 WL 4137594, at *6 (Tex. App.—Eastland Aug. 30, 2018, no pet.) (mem. op., not designated for publication) (considering that minimal amount of time had elapsed between the exciting event and statement made).

Although Sergeant Y did not speak with B.M. at or near the scene of the offense, Sergeant Y was the first officer to speak with B.M. when B.M. arrived at the police station to report the sexual assault. Sergeant Y also described B.M. as "very upset and distraught." Sergeant Y testified that B.M. cried as she spoke, and the "more [he] spoke to her certain things triggered her for her to cry more." *See Rodriguez v. State*, No. 11-18-00101-CR, 2020 WL 1467259, at *4 (Tex. App.—Eastland Mar. 26, 2020, no pet.) (mem. op., not designated for publication) ("Trial counsel could also have reasonably concluded that [the victim's] statements to [an officer] were admissible as excited utterances in light of the testimony that [the victim] was crying and seemed frightened."). As with Sergeant Y, Investigator Bell

did not speak to L.B. immediately after the assault. Investigator Bell spoke with L.B. after she was transported to the hospital; Investigator Bell nonetheless described L.B. as still in a "very emotional" state, "very disturbed and shaken up." Even though it is unclear how much time had passed between the assault and when Sergeant Y spoke with B.M. or when Investigator Bell spoke with L.B., the record reflects that B.M. and L.B. were still dominated by the emotions and stress of the situation when speaking with officers. *See McFadden*, 2018 WL 4137594, at *6; *see, e.g.*, *Lane v. State*, 111 S.W.3d 203, 211 (Tex. App.—Eastland 2003), *aff'd*, 151 S.W.3d 188 (Tex. Crim. App. 2004) (affirming trial court's ruling that the assault victim's statement to police officers on the night of the offense after she had been transported to the hospital for treatment were admissible as excited utterances under Rule 803(2)).

In each instance, the victims were described as being in an emotional state from recent sexual assaults or attempted sexual assaults. The trial court could reasonably have concluded that these victims continued to be dominated by the emotions, excitement, fear or pain that was caused by the sexual assaults. *See Templeton*, 629 S.W.3d at 626. The admissibility of an out-of-court statement under an exception to the general hearsay exclusion rule is within the trial court's broad discretion to admit and exclude evidence at trial. *Zuliani*, 97 S.W.3d at 595.

Accordingly, in light of the circumstances surrounding the statements combined with the wide discretion of the trial court, the trial court would not have erred in overruling counsel's hearsay objections to these statements. *See Poor*, 715 S.W.3d at 41, 43. Thus, Appellant has not shown that trial counsel's performance fell below an objective standard of reasonableness in failing to object to this aforementioned testimony. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142; *Poor*, 715 S.W.3d at 43.

### C. *Strategic Decisions*

Finally, we address the two remaining challenged statements: Sergeant Kristufek's statements that A.V. identified Appellant in a lineup and Investigator Bell's statements that B.R. identified Appellant in a lineup. Significantly, Sergeant Kristufek's and Investigator Bell's statements that the respective victims identified Appellant in a lineup is not hearsay. TEX. R. EVID. 801(e)(1)(C) (a statement identifying a person as someone the declarant perceived earlier is not hearsay if the declarant-witness testifies and is subject to cross-examination about the prior statement); *Price v. State*, 502 S.W.3d 278, 284–86 (Tex. App.—Houston [14th Dist.] 2016, no pet). Both A.V. and B.R. also testified that they identified Appellant in a lineup. And to the extent that Appellant argues that his counsel rendered ineffective assistance based on Investigator Bell's unobjected-to statement that B.R. said "she had a very good visual of him," before identifying Appellant in the lineup, on this record, we must presume that any inaction by Appellant's trial counsel in either of these instances resulted from a tactical choice to incur the risk posed by possible hearsay to avoid drawing unnecessary attention to single sentence statements by officers where the same evidence would be admitted properly elsewhere. *See Delrio*, 840 S.W.2d at 447; *see, e.g.*, *Rodriguez v. State*, No. 11-19-00340-CR, 2021 WL 5365966, at *5 (Tex. App.—Eastland Nov. 18, 2021, pet. ref'd) (mem. op., not designated for publication).

In sum, Appellant has not sufficiently controverted the strong presumption that his trial counsel's performance was within prevailing professional norms. *See Strickland*, 466 U.S. at 689; *Isham*, 258 S.W.3d at 250. Appellant's ineffective-assistance claim therefore fails because he has not proven by a preponderance of the evidence that his trial counsel's performance was deficient. *See Lopez*, 343 S.W.3d at 142; *Prestiano v. State*, 581 S.W.3d 935, 948 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). We overrule Appellant's sole issue on appeal.

## IV.  *This Court's Ruling*

We affirm the judgments of the trial court.

W. BRUCE WILLIAMS

JUSTICE

December 18, 2025

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.